William E. Dunn and Beatrice E. Dunn v. Commissioner.
Dunn v. Commissioner
Docket No. 92129.
United States Tax Court
T.C. Memo 1963-301; 1963 Tax Ct. Memo LEXIS 45; 22 T.C.M. (CCH) 1583; T.C.M. (RIA) 63301; November 1, 1963
*45 1. Petitioners' advances to two corporations in which they were the only stockholders held to be nonbusiness bad debts or additional investments in the corporations, the losses on which were deductible as a capital loss. 2. Petitioners are liable for additions to tax for failure to file a declaration of estimated tax for 1954 and for late filing of their income tax returns for 1957 and 1958. Albert Hessberg II, for the petitioners. Warren S. Shine, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined the following deficiencies in petitioners' income tax and in additions thereto under section 294(d)(1)(A), I.R.C. 1939, and section 6651(a), I.R.C. 1954, for the following taxable years: Deficiency
Income
Sec. 294
Sec.
Year
tax
(d)(1)(A)
6651(a)
1954
$137.84
1956
$21,644.39
1957
6,608.18
$1,321.64
1958
6,362.68
636.27
The issues for decision are: (1) Whether petitioner William E. Dunn, who will hereafter be called petitioner, is entitled to a deduction in 1956 for business bad debts or losses by reason of the worthlessness of alleged debts due him from his controlled corporations, Dunn Garden Apartments, Inc., and William E. Dunn Supply Co., Inc. (hereafter *46 called, respectively, Garden and Supply); (2) whether petitioners are liable for the addition to tax under section 294(d)(1)(A), I.R.C. 1939, by reason of their failure to file a declaration of estimated tax for 1954; and (3) whether petitioners are liable for additions to tax under section 6651(a), I.R.C. 1954, for the years 1957 and 1958 by reason of their failure to file timely returns for those years. Some of the facts have been stipulated and are found accordingly. Petitioners are husband and wife who resided in Troy, New York, during the years in issue. They filed joint Federal income tax returns for the years 1954, 1956, 1957, and 1958 with the district director of internal revenue, Albany, New York. Petitioner became engaged in the building business in Troy in 1929 and since that time he has constructed numerous homes and commercial buildings, always in an individual capacity except on two occasions early in his career in the construction business. He is also a licensed real estate broker. In 1949 petitioner decided to build a multipleunit apartment development in Troy. After discussing the matter with city officials he proceeded to find out what might be required in order *47 to obtain an FHA commitment for an insured loan for the project. He was advised by representatives of the FHA that a commitment could be authorized for the project but only if he organized a corporation to construct and own the development. Petitioner found a purchaser for the mortgage which was to secure the construction loan, a prerequisite for obtaining the loan from a local bank. He organized Garden, under the laws of New York, on August 1, 1950, for the purpose of constructing and operating the 191-unit apartment development. Petitioners owned all the issued and outstanding common stock of Garden and petitioner was a director and the principal officer and executive of the corporation. One hundred shares of preferred stock of Garden were authorized and issued to FHA as a condition to a grant by that agency of mortgage insurance for which petitioner, on behalf of Garden, had applied under the provisions of section 608 of the National Housing Act. Pursuant to this application the Federal Housing Commissioner issued an insurance commitment for the project in the amount of $1,580,000. Garden began construction of the development in about August 1950, but unforeseen difficulties in *48 procuring materials during the Korean War developed and Garden had to buy some material at retail prices and order it well in advance. Also, labor costs increased; completion of streets was delayed; and tax assessments were raised. Construction of the apartment project was completed by Garden in November 1952, but leasing did not begin until later because the City delayed in completing the streets providing access to the project. Upon incorporation of Garden, petitioner contributed land having a basis in his hands of $16,200 [1] and cash in the amount of $17,000. Thus, his total capital investment in Garden was $33,200. He made advances to Garden in the total amount of $31,324.02 in order to cover unanticipated costs of construction, taxes, and maintenance of the apartment project. He received no notes evidencing these advances but he considered them to be loans. In the late 1930's or early 1940's petitioner established the Dunn Supply Company, a sole proprietorship, to buy building material for his construction business. Competing builders complained to the suppliers that petitioner was being sold material for his business at wholesale prices, *49 so in 1947 he formed Supply as a corporation under the laws of New York to engage in the business of selling building material and electrical appliances at retail. Operations commenced in 1949 when petitioner ceased carrying on the similar business as a sole proprietor. At all times material hereto, all the capital stock of Supply was owned by petitioners; and petitioner was the principal officer and a director of Supply. According to the books of Supply, its capital stock was issued for $25,000. Supply filed Federal income tax returns on the basis of a fiscal year ended November 30. In the construction of the apartment development Supply furnished about 90 percent of the building material used by Garden and during this period, while it would sell at retail to anyone who came into its place of business, nearly all of Supply's sales were to Garden. Garden owed Supply for materials used, and, in turn, Supply owed its suppliers. As funds were required by either corporation, petitioner advanced money as it was needed. Since he owned both corporations, he did not consider that it mattered to which he advanced money. Supply ceased doing business in 1952. Its assets were sold at auction and *50 all the proceeds used to pay creditors. Petitioner was personally liable to some of the creditors of Supply, and these he paid to the extent that he was able. The only asset of Supply left was the amount of advances to Garden and accounts receivable from Garden. As of Supply's taxable year ended November 30, 1952, its books of account reflected a credit balance of $45,970.49 in the account termed "William E. Dunn, Personal." The entire amount of this credit balance resulted from a combination of the following: [2] (1) Cash deposited in Garden's bank account directly by petitioner, which was shown on Garden's books as an account payable to Supply. The income tax returns of Supply showed such amounts as an "Investment" in Garden. (2) Cash deposited in the bank account of Supply by petitioner and used to pay debts of Garden or which was turned over to Garden by Supply, but in either event these amounts were also shown on the tax returns of Supply as an "Investment" in Garden. There were no further entries in the "William E. Dunn, Personal" account on the books of Supply after November *51 30, 1952, so the credit balance of $45,970.49 remained the same. On November 9, 1956, petitioners entered into an agreement by which they agreed to sell all their stock in Garden to certain individuals. As part of this agreement petitioners released Garden from any debts and obligations which might be owing to them. Petitioner also caused Supply to execute a similar release to Garden as part of the transaction. [3] Petitioners received for their stock in Garden $8,000 and the buyer's promise to discharge certain debts of Garden which had been personally guaranteed by petitioner. On their Federal income tax return for 1956 petitioners claimed a deduction for a "business loss" in the amount of $114,139.75, explained in a schedule attached as follows: Business loss
Dunn Garden Apts.
Stock Dunn Garden Apts.
$ 17,000.00
Stock Dunn Supply Co.
25,000.00
Advance Dunn Garden Apts.
47,111.23
Advance Dunn Supply Co.
45,970.49
$135,081.72
Loss as above
$135,081.72
Loss carry-
back
1954
$10,240.45
1955
10,701.52
20,941.97
Loss to be applied
$114,139.75
*52 On their income tax returns for 1957 and 1958 petitioners claimed deductions for net operating loss carryovers resulting from the foregoing "business loss." In a statement attached to the notice of deficiency herein is the following explanation: Business Loss
Business loss claimed in amount
of $114,139.75 has been allowed
only to the extent of $1,000.00
Revenue Agent's Report dated
April 10, 1959 indicated that the
loss was $64,524.02 instead of
$114,139.75 and was composed
of:
$113,139.75
Investment in stock of Dunn
Garden Apts. Inc.
17,000.00
Additional investment (value
of land transferred to Corpo-
ration)
16,200.00
Advances to Corporation
31,324.02
$ 64,524.02
The loss of investment in the Corporation is a Capital loss. The loss of advances to the Corporation is a non-business bad debt, and as such, is a short-term capital loss under the provisions of section 166(d)(1)(B), 1954 internal Revenue Code. Our treatment of the debt as a non-business bad debt is based on the determination that you were engaged principaily in the building and contracting business and not in the business of promoting, organizing and managing business enterprises. Therefore, the entire loss of $64,524.02 is a capital loss *53 and is limited to a deduction of $1,000.00 in the year 1956 as provided in section 1211(b) of the 1954 Internal Revenue Code. * * * Respondent allowed petitioners a $1,000 deduction in each of the years 1957 and 1958, representing a capital loss carryover. At the trial and on brief the parties agree that petitioner's investments in the stock of Garden in the amount of $33,200 ($17,000 cash and $16,200 land) and in the stock of Supply in the amount of $25,000 were investments in capital assets which became worthless in 1956 resulting in capital losses in that year. Petitioner who had no bookkeeping experience, retained an accountant who prepared his returns for 1956, 1957, and 1958 with whom he discussed the advances to Supply and Garden. Petitioner relied upon him to prepare petitioners' returns. On April 11, 1958, petitioner signed an application for extension of time for filing petitioners' 1957 return. The reason given for the request was: "Due to the illness of my bookkeeper, completed figures will not be available by April 15, 1958." It was requested on the application that the extension be sent to petitioner. No evidence was presented as to whether the extension was granted. *54 Petitioners' return for 1957 was received by respondent on or about July 18, 1958. By permission addressed to petitioner an extension of time for filing petitioners' 1958 return was granted to July 15, 1959. Petitioners' 1958 return was filed on or about August 25, 1959. Petitioners did not file a declaration of estimated tax for 1954. The failure of petitioners to file a declaration of estimated tax for 1954 and timely returns for 1957 and 1958 was not due to reasonable cause. Opinion The principal issue for decision is whether petitioners are entitled to a deduction in 1956 as a business bad debt or loss in the amount of petitioner's advances to Garden and Supply, being $31,324.02 and $45,970.49, respectively. Petitioners' income taxes for the years 1957 and 1958 are involved because of a carryover of part of the claimed operating loss from 1956. The amounts of the advances are stipulated and the parties agree that the advances to Garden were loans and gave rise to a debt which became worthless in 1956. Respondent argues that the advances to Garden gave rise to a nonbusiness bad debt, the loss on which was deductible only as a capital loss, and that the advances to Supply were either *55 a contribution to capital or gave rise to a nonbusiness bad debt, in either event the loss being deductible only as a capital loss, and also that petitioner has failed to prove that the investment or debt did not become worthless prior to 1956. Petitioners claim that the advances to both corporations gave rise to business bad debts deductible in full under section 166 of the Code, [4] or, in the alternative with respect to the advances to Supply, were losses incurred by them either in their trade or business or in transactions entered into for profit, deductible in full under section 165. With respect to the advances to Garden, we are not entirely clear on petitioners' position. They agree that the advances were loans and gave rise to a debt, and they recognize that under Putnam v. Commissioner, 352 U.S. 82 (1956), where the loss arose out of the worthlessness of a debt, its deductibility is governed by the bad debt provision of section 166 [5] and cannot be claimed as a loss under section 165. [6] *57 They claim that the amount of the advances was deductible as a business bad debt because it was either *56 created or acquired in connection with their trade or business or was a debt the loss from the worthlessness of which was incurred in their trade or business. Their argument in support of the first claim appears to recognize the corporate entity of Garden, but their argument on the second claim seems to suggest that we ignore the corporate entity of Garden, treating it as the alter ego of petitioner, and considering Garden's business as that of petitioner. We find no basis for ignoring the corporate entity of Garden. Initially, the mere recognition of the advances to Garden as loans giving rise to a debt from Garden to petitioner requires recognition of the corporate entity of Garden. Furthermore, Garden was formed for a business purpose, it actively engaged in the business of constructing and managing the apartment complex, it kept its own books and records and filed its own tax returns, and in the sale of 1956 petitioners sold their stock in, rather than the assets of, Garden, which may still be in existence as far as we know. There is no question of substance prevailing over form, Gregory v. Helvering, 293 U.S. 465 (1935). Garden was real in substance as well as form and its separate entity cannot be ignored, Burnet v. Clark, 287 U.S. 410 (1932). The business of building and managing the apartment complex was that of Garden and its business cannot be deemed to be that of petitioner, despite his activities in connection therwith and his position as controlling stockholder. Whipple v. Commissioner, 373 U.S. 193 (1963), rehearing denied 374 U.S. 858 (1963); Charles G. Berwind, 20 T.C. 808 (1953), *58 affirmed per curiam 211 F. 2d 575 (C.A. 3, 1954). Nor is there any evidence that petitioner was in the business of promoting or financing corporations or of lending money, in which business this loss may have been incurred. See Whipple v. Commissioner, supra; H. Beale Rollins, 32 T.C. 604 (1959), affd. 276 F. 2d 368 (C.A. 4, 1960). So petitioner's advances to Garden cannot qualify as a debt the loss from the worthlessness of which was incurred by petitioner in his trade or business. Nor do we think the debt from Garden qualifies as a debt created or acquired in connection with petitioner's trade or business. Petitioner's business prior to 1950 was primarily that of a builder. The evidence indicates that during the period from August 1950 until sometime in 1954, after the advances were made and the apartment complex was completed, he devoted practically all of his time to running the affairs of the two corporations, principally Garden, although he did testify that, in his individual capacity, he built one or two houses for friends or relatives during the period. At the time the advances were made, petitioner's principal business appears to have been that of an officer and employee *59 of the two corporations. Being the controlling stockholder of the corporations, it cannot be said that petitioner was required to make these advances to obtain or protect his employment within the purview of Trent v. Commissioner, 291 F. 2d 669 (C.A. 2, 1961), reversing 34 T.C. 910 (1960). Rather, petitioner's advances were made in connection with or to protect his investment. See Eugene H. Rietzke, 40 T.C. 443 (1963), on appeal (C.A. 4, Sept. 27, 1963); George P. Weddle, 39 T.C. 493 (1962). Assuming that petitioner was in the real estate and building business in his individual capacity at the time he made these advances, there is no basis for finding that these advances were created or acquired in connection with or were proximately related to that business. While petitioner may have been required to use a corporation for construction of the apartment complex in order to obtain an FHA loan, the fact remains that he voluntarily set up a separate corporate entity to construct, own, and manage this development. The success or failure of the corporate venture could only remotely affect his individual building business - and there is no evidence that it did. The mere fact that petitioner *60 happens to be in a business similar to that of a corporation, without more, does not provide the causal connection necessary to qualify advances made by petitioner to the corporation as a business debt of petitioner. See Darwin O. Nichols, 29 T.C. 1140 (1958). Cf. S. E. Maitland Brenhouse, 37 T.C. 326 (1961). We conclude that the loss from petitioner's advances to Garden was a loss from a nonbusiness bad debt deductible only as a capital loss. Most of what has been said above also applies to the advances made to Supply. Supply was incorporated for a valid business purpose. It actively engaged in business in its own name and kept its own books and records and filed its own tax returns. Its corporate entity cannot be ignored. With respect to the advances to Supply, however, it can be argued that inasmuch as petitioner formed Supply in order to buy building supplies at wholesale prices for Garden and, supposedly, for his individual building business, there could be some connection between his lending of funds to Supply and his individual building business. See J. T. Dorminey, 26 T.C. 940 (1956); Tony Martin, 25 T.C. 94 (1955); Stuart Bart, 21 T.C. 880 (1954). But the evidence does *61 not support the thesis that petitioner made these advances to Supply to protect his supply of building materials at wholesale prices for his individual building business. To the contrary, the evidence rather clearly establishes that these advances were all made directly in connection with supplying Garden with the building materials necessary to complete construction of the apartment complex. Furthermore, there is considerable doubt whether the advances to Supply were loans giving rise to a debt, rather than being an investment. It is obvious from petitioner's testimony that all his advances were made for the benefit of Garden and he did not think it mattered whether he advanced sums directly to Garden or to Supply. In any event, the advances appeared on the books of Supply as an "Investment" in Garden. Under one view of the case, petitioner would seem to have been advancing money to Supply with which to make a capital investment on behalf of Supply in Garden. But possibly a more correct view, and the one supported by petitioner's testimony, is that he was simply investing in Garden regardless of whether he deposited funds to the bank account of Garden or Supply. This conclusion is *62 also supported by the fact that when petitioners sold their stock in Garden they gave a release not only of all obligations due from Garden to themselves but also of all obligations due from Garden to Supply. If it be considered that petitioner was making payments to Supply on behalf of Garden, he would thereby be making a capital contribution to Garden. W. D. Roussel, 37 T.C. 235 (1961), on appeal (C.A. 5, May 14, 1962). Furthermore, a debt implies not only a legal obligation to pay but also expectancy on the part of the creditor to receive payment. W. D. Roussel, supra. There is no evidence that petitioner ever anticipated repayment of funds advanced to Supply or that he could reasonably have done so. The absence of any specified date for repayment, of the payment or the accrual of interest, and of notes or other evidence of a debt indicates that petitioner's advances to Supply did not represent debts, the worthlessness of which could support a business bad debt deduction, but rather represent additional investments in Garden, whether directly or through Supply. Estate of Dominick F. Pachella, 37 T.C. 347 (1961), affirmed per curiam 310 F. 2d 815 (C.A. 3, 1962); Lewis L. Culley, 29 T.C. 1076 (1958). *63 Nor can we agree with petitioners' argument that the loss on petitioner's advances to Supply was a loss on a transaction entered into for profit. At most he could only have expected a return of the advances and, as indicated above, he had little reason to anticipate even this. Whether petitioner's advances to Supply represented an additional investment in Garden or loans giving rise to nonbusiness bad debts, petitioner's loss on these advances would be deductible only as a capital loss and petitioners are therefore not entitled to the deductions which they claim. The next issue is concerned with petitioners' liability for additions to tax for failure to file a declaration of estimated tax for 1954 and for late filing of their 1957 and 1958 returns. It is admitted that petitioners did not file a declaration for 1954 and that they filed their 1957 and 1958 returns late, but petitioner testified that he entrusted his records and his tax matters generally to an accountant who, he thought, was filing returns as and when required. The accountant did not testify and there is no evidence whatever concerning his qualifications or any instructions given, or advice sought from, him. Petitioners *64 must show that their failure to file a declaration for 1954 and timely returns for 1957 and 1958 was due to reasonable cause and not to willful neglect. Sec. 294(d)(1), I.R.C. 1939; Sec. 6651(a), I.R.C. 1954. We have no facts whatever concerning the declaration for 1954. A request for an extension for filing the 1957 return was signed and filed by petitioner, giving as a reason the illness of a bookkeeper. There is no evidence that the request was granted, or that the reason given existed, or that if it did exist it would supply reasonable cause for late filing. A request for an extension for the 1958 return was granted, but the return, which was undated, was stamped by the district director as being received 40 days after the due date as extended. Petitioner's execution of the requests and of the returns indicates he knew the returns were being filed late and also belies his generalized testimony regarding complete reliance on the accountant. See Malcolm Clifton Davenport, 6 T.C. 62 (1946). Furthermore, there is no evidence that the accountant was a competent tax adviser, which must appear if reliance on the accountant is to be used as reasonable cause for late filing. Petitioners *65 argue on brief that the returns were filed late because the Government was checking on petitioner's business activities and his income tax affairs were in an unsettled state. This would indicate a deliberate late filing, but without more would not constitute reasonable case therefor. Lacking evidence to support a finding of reasonable cause, we are constrained to sustain respondent's determination. Decision will be entered for the respondent. Footnotes
1. Which petitioner says was valued at $100,000.↩
2. As stipulated; however, petitioner testified that at times he advanced money to Supply to pay its own bills.↩
3. Petitioner testified that at some time prior to 1956 Carden sought additional funds from FHA and in connection therewith was required to issue 20-year nonnegotiable notes to Supply and petitioner for the amounts shown on Garden's books as owing to them. The notes were not produced in evidence.↩
4. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
5. SEC. 166(d)(2). Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. ↩
6. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * *