A. HARRIS & CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 12123, 13998, 22502. Promulgated May 27, 1929.

*J. Marvin Haynes, Esq.,* and *Albert G. Moss, C. P. A.,* for the petitioner.

*P. M. Clark, Esq.,* for the respondent.

## OPINION.

LOVE: The fourth and fifth issues have been settled by stipulation and accordingly we find for the petitioner: (a) that its net income for the fiscal year ended January 31, 1921, as determined by the respondent, shall be decreased in the amount of $1,812.99 representing depreciation on a "balconade" acquired by the petitioner on May 1, 1920, at a cost of $24,173.25. The rate of depreciation shall be 10 per cent per annum, and the period of depreciation is nine months; (b) that its invested capital at February 1, 1920, shall be increased in the amount of $22,500, representing a dividend declared but unpaid at that date, excluded by the respondent from the petitioner's surplus.

In the first issue raised, we are of the opinion that the petitioner's contention that the payment to its former creditors, of $31,196 during its fiscal year ended January 31, 1920 (and amounts of an identical nature in subsequent years), constituted a part of the ordinary and necessary expenses paid in carrying on its trade or business, is not well taken. Without quibble as to whether these payments were "ordinary" and/or "necessary" expenses, we hold that clearly they did not constitute nor partake at all of the nature of business *expenses*, the benefit from which was exhausted in the taxable year in which the payments were made; but that they constitute an outlay and investment of capital deemed essential to restore the petitioner's credit which had been dissipated by its composition agreement with its creditors in April, 1915. It seems to us that the testimony of Arthur L. Kramer, the petitioning taxpayer's president since early in 1913 and its only witness, supports this conclusion so strongly as to render impossible any other.

Kramer testified that as a result of that composition, the "mercantile agencies gave us a bad credit rating"; that it made it "increasingly difficult to buy merchandise"; and that it had "a sort of bad moral effect." The market for the sale of commercial paper through note brokers "became closed to us at that time. We were not able to borrow on the open market." He testified that the large concerns in New York with whom the petitioner had been in the habit of dealing "were not willing to sell us again on credit" and that some would not sell "even on a cash basis." This condition "lasted up to the time that we made the first voluntary payment to the creditors * * * until about September 1, 1919."

Shortly before that date, at a conference with the petitioner's bankers, it was decided that making such voluntary payments "was the only way we were going to restore our credit standing and that

the restoration of our credit standing was a necessity in our business, and we decided then to make the first payment at that time."

On cross-examination:

Q. In making those payments to creditors you felt that you were doing something which was going to be of value to you in the years to come, didn't you?

A. I thought it would have that effect.

Redirect:

Q. Mr. Kramer, on cross-examination you were asked to state whether or not you ever expected to benefit in the future from these voluntary payments made to the creditors. I wish you would state just how you expected to derive this benefit.

A. Well, Mr. Haynes, that was just more or less the understanding of the whole thing. We made the payments because we found it was necessary to do it in order to restore our credit.

In the statement of facts propounded by the petitioner and which we have on this point adopted verbatim as our own findings, it is asserted that these voluntary payments to former creditors were the *only way* that the petitioner could relieve the *adverse situation resulting from the 1915 composition agreement*. And this has been fully substantiated by the testimony of the witness. The composition had failed of its purpose and the last state of the petitioner was worse than the first. Some immediate action had to be taken to preserve the very life and continuity of the business and the petitioner adopted the *only* remedy; it followed the *only way* that was left open to it, and brought back the credit which it had sacrificed in 1915. Credit is an intangible thing, but in the complexity of our modern economic structure, it is, for the business man or corporation, the pearl of great price; that essential asset without which, it may almost be said, none can engage in present-day commercial or even professional activities, except in the simplest way and upon the smallest scale.

The recovery of that essential asset was confessedly the chief purpose that motivated the so-called voluntary payments to former creditors. There was then under consideration no abstract moral issue; the payments were made to secure the possession of a real though intangible thing, not for a day, a month or a year, but for all time, so long as the petitioner's business might endure. And, as the evidence shows, the payments accomplished the purpose and secured the thing for which they were made, for " immediately after the first payment," says the witness, " it had the effect of restoring credit. Up to that time our rating in Dun and Bradstreet had been a negative rating after our composition with the creditors, and then after the payments immediately they gave us a first grade rating." The first payment " had a very valuable effect. We were able to buy merchandise in the regular way, with regular terms and with the regular dis-

counts that we had been previously able to do. It restored the (negotiable paper) market to us and we were able to discount our paper in the open market. It had a favorable effect in that I suspect it lowered our cost of doing business, because we immediately discontinued this ticket expense, the redemption of moving picture tickets, and it enabled us to borrow money at a lower rate of interest and to take our discounts on purchases."

These purely incidental secondary results in no way minimize or modify the fact that the *restoration of credit* was *the* object that it was hoped to obtain and which was obtained by these payments. This accomplished, the other results followed as matters of course.

Under conditions such as are pictured in the petitioner's statement of facts and in the testimony of its witness, we do not see how we can do other than find for the respondent. In *Herbert Brush Manufacturing Co.*, 15 B. T. A. 673, a case substantially on all fours with this present proceeding, we found that the benefit anticipated from such payments as these was an improved (in this case, a restored) credit reputation or standing; that is to say, an intangible asset with a probable life coextensive with the business; and we held that as such it did not represent a current transaction, the whole or any part of which is allowable as a deduction for income-tax purposes. We so hold here.

We find for the petitioner in its allegation that the Commissioner erred in excluding from invested capital certain notes in the amount of $100,750 paid in on June 1, 1920, for capital stock. The testimony of the witness Kramer stands unrefuted and unchallenged.

He testified that on the above date the capital stock of the petitioner was increased in the sum of $200,000, of which $99,250 was paid in cash and $100,750 in notes executed by himself and seven others, which notes were accepted by the petitioner as the equivalent of cash. With the exception of one 30-day note, all were due in two years after date. The witness knew all the makers well. To most of them he was related by either consanguinity or affinity. He was acquainted with the financial responsibility of the makers of all of these notes and in June, 1920, the fair market value of the notes was their face value. They all bore interest at 8 per cent; the interest was paid as due and the notes were paid on or before the dates of maturity. An amount of $71,710 was paid on a joint note for $87,000 of the witness and his brother-in-law, Leon Harris, by the transfer of a warehouse owned jointly in equal parts by them, and used exclusively in the business of the petitioner. The remainder of that note and all the other notes were paid in cash.

Under similar circumstances the Board, in a number of cases, has held that such notes were properly included in invested capital.

In *Appeal of American Steel Co.*, 1 B. T. A. 839, we repeated what we had said in *Appeal of Hewitt Rubber Co.*, 1 B. T. A. 424, and we quote again here:

Congress intended by the language used in section 326(a) that for the purpose of computing the profits tax, notes in reality and without fraud or collusion paid in for stock should be included in invested capital unless such *sale* of stock is rendered absolutely void by positive statute. * * * A state statute imposing certain restrictions upon corporations for the purpose of enforcing full payment for its stock, designed and intended to serve an entirely different purpose, can not operate to nullify the plain provisions of the Federal statute.

The bona fide sale of stock in the instant case fulfilled every condition as set forth above. The case first cited *supra* was that of a New York corporation; the second, that of a Pennsylvania company. We have under consideration here a Texas corporation, but we find nothing in the statutes of that State that makes it necessary to distinguish it and except it from our earlier rulings.

Article XII, sec. 6, of the Constitution of Texas, is as follows:

No corporation shall issue stock or bonds except for money paid, labor done or property actually received, and all fictitious increase of stock or indebtedness shall be void.

Article 1146 of the Revised Statutes of Texas of 1914, in effect at the time of the transactions herein considered, reads as below:

No corporation, domestic or foreign, doing business in the state, shall issue any stock whatever, except for money paid, labor done, which is reasonably worth at least the sum at which it was taken by the corporation, or property actually received, reasonably worth at least the sum at which it was taken by the company. Any corporation which violates the provisions of this article shall, on proof thereof in any court of competent jurisdiction, forfeit its charter, permit or license, as the case may be, and all rights and franchises which it holds under, from or by virtue of the laws of this state.

When a Texas corporation is organized or its stock increased, the statutes require that (1) the full amount of stock or of the increase must then be subscribed; (2) 50 per cent thereof must be paid in at that time; and (3) the remaining unpaid 50 per cent of the subscription must be paid within 2 years.

Counsel for the petitioner admits in his brief that by judicial interpretation the unsecured note of a subscriber to capital stock is held in Texas not to be " property actually delivered " within the meaning of the foregoing provisions. The courts of Texas hold that property has not been actually delivered to the corporation until the note has been actually paid, and that until that time the statutory obligation of the subscriber has not been fulfilled. But it is argued that the transactions interdicted by the constitution and the statute above quoted, are those in which 50 per cent of the subscription has not been paid in, but in which payment is attempted by the giving

of a note, or the stock is finally issued and delivered in consideration of merely a note. It is contended that where, as in this case, 50 per cent of the stock increase was actually paid in cash at the time of the increase, and notes given payable in two years for the remainder, the transaction is perfectly legal. And so it seems to us.

In *Washer* v. *Smyer*, 211 S. W. 987, where stock had been issued and delivered in consideration of a note, but with no cash or other payment, the court said:

There is no declaration in the constitutional provision that a transaction in which someth'ng other than money, property, or labor is received in payment for the corporation's stock, shall be utterly void. It prohibits such a transaction and therefore makes it unlawful, but that is the extent to which it goes. If a security be accepted in payment for the stock, such, for instance, as a subscriber's note, which is not property for such a purpose, the Constitution does not say either that it, or the stock issued for it, shall be void. The acceptance of the note in payment for the stock and the issuance of the stock are only interdicted. The word "void" is used but once in the constitutional provision, and that, it is to be noted, is not in the clause which prohibits the issuance of stock for other than money, property or labor. It is in the distinct clause which says that all fictitious increase of stock or indebtedness shall be void. While the term is found in that clause of the section, the framers of the Constitution avoided its use in the other. It must be assumed that they did so deliberately.

There is an essential d fference between prohibiting a certain form of transaction—mak ng it unlawful, and declaring that it, with all securities issuing out of it, shall be utterly void. It is a distinction famil'ar in the law.

In order to hold a negot'able note unenforceable in the hands of a bona fide holder, it is not enough that it be founded upon an illegal consideration. It is not sufficient that it issue from a transact'on prohibited by law, or one even denounced as criminal. To avoid it in the bona fide holder's hands there must be a constitutional or statutory provision which *expressly*, or by unavoidable implication, declares it or the transaction of wh'ch it is a part, to be *void*. Such is the rule announced by Chitty, Story and Daniel. It is the rule followed by this court, and generally by courts elsewhere. (Italics are the court's.)

There is more of this tenor in the opinion from which the above is quoted and it would be easy to multiply similar pronouncements by the Texas courts, but we think that we have said enough to warrant us in holding that in this respect the Texas statutes do not differ in substance from those of New York and Pennsylvania, under which we held that such notes received in good faith should be included in the taxpayer's invested capital at their fair market value. We so hold here and we find that the fair market value of the notes here in question, was on June 1, 1920, and at all subsequent times until their dates of maturity, their face value.

In respect to its third issue, the petitioner admits that we have heretofore disposed of the point concerning the running of the statutory period in *John Wanamaker Philadelphia*, 8 B. T. A. 864, with which holding the petitioner does not agree. The petitioner

raises the issue here to protect its rights of appeal, all of which it reserves in the event that it deems an appeal advisable. On this point we find for the respondent.

In view of the decision in respect of the issues other than the claim for special assessment, the abnormality claim may no longer exist, and for that reason we do not pass at this time upon petitioner's claim for special assessment. The Commissioner is directed to file a recomputation of the tax liability for the taxable years in accordance with this opinion, and if the petitioner so desires, after service of a copy of such computation, the Board will make a determination in respect of the special assessment issue, upon motion of the petitioner to that effect. Otherwise judgment will be entered under Rule 50.