W. D. AND SEDLEY ROUSSEL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 77992. Filed November 21, 1961.

*Thomas H. Kingsmill, Jr., Esq.,* and *Albert B. Koorie, Esq.,* for the petitioners.

*J. L. Bailey, Esq., E. A. Eagleton, Esq.,* and *S. George Voss, Esq.,* for the respondent.

FISHER, *Judge:* Respondent determined deficiencies in income tax of the petitioners as follows:

| Year | Amount |
|------|--------|
| 1953 | $7, 639. 90 |
| 1954 | 13, 036. 24 |
| 1955 | 8, 099. 77 |
| 1956 | 1, 574. 55 |

It is stipulated that the deficiencies for the years 1953, 1954, and 1956, arose out of the disallowance of a claimed operating loss for

1955 carried back 2 years and forward 1 year, and that all of the deficiencies depend upon the correct amount of operating loss, if any, for the year 1955.

The sole issue for our determination is whether the amount paid by petitioner in 1955 on behalf of the corporation as required by his guarantee, is deductible, in whole or in part, in 1955 either as a business expense, or as a worthless business or nonbusiness debt.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by this reference.

Petitioners, W. D. and Sedley Roussel, are husband and wife with residence in the parish of Orleans, State of Louisiana. Petitioners filed joint Federal income tax returns for the calendar years 1953 through 1956 with the district director of internal revenue, New Orleans, Louisiana. All property owned by petitioners forms a part of the community of acquêts and gains which has continuously existed since their marriage in 1928. However, since the transactions here involved are those of the husband, W. D. Roussel, he will be referred to as the petitioner.

Petitioner has been in the coffee business since 1916 when he was 18 years of age. He was originally employed in that year by Hard & Rand, Inc., a coffee importer, in their branch office in New Orleans. In 1924, petitioner became the manager of the New Orleans branch which position he retained until 1936.

In 1936 Hard & Rand, Inc., abandoned their branch offices, but retained petitioner as their agent in the New Orleans area. In addition to acting as an agent for Hard & Rand, Inc., petitioner conducted his own coffee business.

Petitioner was financially successful in his ventures and as an agent. In 1949 he earned approximately $200,000 from his coffee ventures. As a tax-saving device petitioner was advised by his banker to form a corporation which would be devoted to trading in coffee for his own account.

In 1950, petitioner formed the W. D. Roussel & Company, Inc. (hereinafter referred to as the corporation), a corporation organized under the laws of the State of Louisiana. Petitioner invested $150,000 in the corporation for which he received 1,498 of the total 1,500 shares outstanding. He also served as its president and sole operating manager.

The formation of the corporation was known to Hard & Rand, Inc., and they were agreeable to it. Hard & Rand, Inc., insisted, however, that petitioner continue to represent them personally rather than through the corporation. Hard & Rand, Inc., on various occasions, dealt with the corporation in its purchasing of coffee.

The corporation's business and petitioner's individual business were conducted from the same office. Separate books of account were maintained, however, by petitioner.

Petitioner's individual business, which was basically the agency for Hard & Rand, Inc., accounted for the greater portion of his income during the years 1953 through 1956. The net income derived from each year was as follows:

| Year | Corporation | Individual |
|------|-------------|------------|
| 1953 | $12,000 | $16,002.53 |
| 1954 | 12,000 | 27,989.41 |
| 1955 | 4,500 | [1] 23,772.58 |
| 1956 |  | 26,472.83 |

[1] This figure represents the net income before the $102,340.57 deduction in issue which petitioner has claimed as a business expense for 1955.

In September of 1954, Hard & Rand, Inc., after hearing that the corporation was slow in meeting some of its obligations because of a lack of ready cash, contacted petitioner and asked him if the corporation needed a short-term loan. Although the offer was completely unsolicited by petitioner, an agreement was reached whereby Hard & Rand, Inc., agreed to negotiate a loan to the corporation for 6 months in the amount of $75,000.

As a condition to making the loan, Hard & Rand, Inc., required petitioner to personally endorse the note and to guarantee all of the corporation's indebtedness to it which would accrue to December 31, 1954. Petitioner, thereupon, on September 2, 1954, executed a guaranty to Hard & Rand, Inc., which states, in part:

we do hereby guarantee you against loss by reason of any indebtedness now owing to you by said W. D. Roussel & Co., Inc., or by reason of any indebtedness which shall hereafter, prior to December 31, 1954, be incurred and become and be owing to you by said W. D. Roussel & Co., Inc., and we do further promise and agree that, if and when requested by you, we, and each of us, will give to you a mortgage, in proper legal form under the laws of Louisiana, to protect you against any such loss, upon each of the following parcels now owned by us individually or jointly: * * * [parcels enumerated].

The real estate described in the said titles is free and clear of all encumbrances and the taxes on said property have been paid up to and including those for the year 1953, and we hereby bind and obligate ourselves neither to sell nor encumber the said real estate in any manner until all indebtedness covered by this guaranty to you has been paid in full.

On September 7, 1954, Hard & Rand, Inc., loaned the corporation the sum of $75,000 and the latter signed a promissory note in that amount which was endorsed by petitioner individually. The note was payable on March 7, 1955.

At the time of the loan and guaranty (September 1954) the corporation was in a solvent condition.

On December 31, 1954, the cutoff date of the personal guaranty by petitioner to Hard & Rand, Inc., the corporation had accounts payable to Hard & Rand, Inc., in the amount of $30,840.57, in addition to the $75,000 on the note not yet due.

In February of 1955, the corporation paid Hard & Rand, Inc., $5,000 toward the accounts payable leaving a balance of the 1954 accounts payable of $25,840.57. In March of 1955, due to severe business losses accruing from the previous months, the corporation became insolvent and was unable to pay its note or accounts payable to Hard & Rand, Inc.

Petitioner, recognizing his obligation to pay Hard & Rand, Inc., executed a mortgage for $115,000 on the property which was subject to the guaranty agreement in order to obtain the money to pay the corporate debts. Shortly before the note was due, Hard & Rand, Inc., sent its treasurer to New Orleans to obtain mortgages on the property, believing that the corporation was unable to pay the note. Instead of delivering mortgages, petitioner paid over to him $102,340.57, which was the full amount which the corporation owed to Hard & Rand, Inc., and covered the following:

| | |
|---|---:|
| Promissory note | $75,000.00 |
| Interest | 1,500.00 |
| Accounts payable as of Dec. 31, 1954 | 25,840.57 |
| | 102,340.57 |

This amount was credited to petitioner's account on the books of the corporation.

During the latter part of 1954 and the beginning of 1955 the corporation suffered severe financial losses due to a "straddle" operation anticipating the increase and decline of different coffees. In the middle of 1955 the corporation had liabilities in excess of $400,000 (including the $102,340.57 owed to petitioner) while its assets totaled approximately $15,000.

In spite of the corporation's obvious inability to pay all of its debts, and disregarding the advice of his attorney to initiate bankruptcy proceedings on behalf of the corporation, petitioner, fearful of the effect it would have on his reputation and standing in the coffee industry, and, therefore, upon his individual business, sought to effect a settlement with the creditors.

In June 1955, the following agreement was signed by all of the creditors of the corporation having claims in excess of $500, except petitioner and Swanson Brothers, Inc.:

The undersigned creditors of W. D. Roussel & Company, Inc., of New Orleans, Louisiana, each holding a claim substantially in excess of $500.00, being reliably informed and believing that said W. D. Roussel & Company, Inc. is hopelessly insolvent, owing debts demandable in the sum of approximately $400,000.00, with assets of a value of less than $15,000.00, and realizing that any attempt

that might be made to cause the distribution of these assets ratably among the creditors of said corporation, through bankruptcy proceedings, would result in the payment of nothing to the creditors, after the payment of costs and expenses in such bankruptcy proceedings, do hereby, each for itself, forever waive, renounce and forgive their respective claims against said corporation.

It is understood that this release is in consideration of its being signed and executed, and will not become effective until and unless it is signed and executed, by all of the creditors of said W. D. Roussel & Company, Inc., as shown on the attached list prepared and certified by Malcolm M. Dienes & Company, Certified Public Accountants, with the exception of (a) those creditors whose claims are $500.00 or less, (b) Mr. and/or Mrs. William D. Roussel, for the claims owing to them or either of them, and (c) Swanson Brothers, Inc., of Chicago, Illinois, for any and all claims owing to it.

Attached to the release is the following list of creditors:

MALCOLM M. DIENES AND COMPANY
318 Carondelet Street
New Orleans

*List of Accounts Payable Over $500.00*
W. D. Roussel & Co., Inc.

As at June 1, 1955

H. de Sola & Hijos
H. L. C. Bendiks, Inc.
Wessel Duval & Co.
Volkart Bros. Co.
Ruffner, McDowell & Burch, Inc.
Hard & Rand, Inc.
Scholtz & Co.
Swanson Bros., Inc.
East Asiatic Co., Inc.
Wm. Morton
C. E. Schmidt
R. C. Wilhelm & Co.
W. R. Grace & Co.
Lafaye & Arnaud
F. J. Vaccaro
Mississippi Shipping Co.
United Fruit Co.
Westfeldt Bros.
Dupuy Storage & Forwarding Corp
C. E. Bickford & Co.
W. L. Korbin
Clifford J. Lafaye
American National Bank & Trust Co.
J. Aron & Co., Inc.
Mr. and/or Mrs. W. D. Roussel

The foregoing list of creditors with balances due them in excesses of $500.00 was prepared by us from the records of the corporation and from information obtained from Mr. W. D. Roussel. We did not confirm the balances due by direct communication with the creditors of record.

Respectfully submitted,

(Signed) Malcolm M. Dienes,
*Certified Public Accountants.*

Although petitioner was listed as a creditor of the corporation on its books and on the list attached to the release, he was specifically exempted from signing the release.

At the time of the release, it was understood under a "gentlemen's agreement" between the creditors and petitioner that the operations of the corporation would be continued with the intention that it would repay the creditors in whole or in part if and when it was able to do so. At that time, there was also the thought that the corporation should continue its operations looking to possible sale as a loss corporation. There is no evidence that the "gentlemen's agreement" was, or was intended to be, legally binding.

The corporation thereupon transferred the amount of $435,630.01 from the accounts payable accounts to the paid-in surplus account. This amount was the total of the released claims of the creditors ($333,289.44), plus the claim of petitioner in the amount of $102,-340.57, arising out of his payment to Hard & Rand, Inc., as required by the terms of his guarantee. Petitioner did not waive, cancel, or release his said claim against the corporation.

The corporation maintained its books and records and filed its Federal income tax returns on a fiscal year basis ending May 31. For the fiscal year ending May 31, 1955, the corporation sustained a loss of $556,441.54. The assets at this time totaled $65,175.95, while the liabilities (excluding the released claims, but including petitioner's debt) totaled $184,970.16.

For the fiscal year ending May 31, 1956, the corporation earned a profit from operations of $22,988.79, and the corporation paid $31,-521.38 to its former creditors. A like amount was deducted from paid-in surplus. The assets at this time totaled $17,180.59 while the liabilities (excluding the released claims but including petitioner's claim) totaled $145,507.39.

From June 1, 1955, to May 31, 1959, the corporation paid the former creditors who had released their claims the amount of $59,307.56, each being paid the same percentage of their original claims. No part of the petitioner's debt of $102,340.57 has ever been repaid to him.

Petitioner continued to be employed as an agent for Hard & Rand, Inc., until December 31, 1956. A change of management of that company occurred during 1956. Petitioner was not aware in 1955 that the agency relationship would be terminated.

Petitioner filed his Federal income tax returns for the years 1953 through 1956 on the calendar year basis.

Petitioner claimed the $102,340.57 which he paid to Hard & Rand, Inc., on behalf of the corporation as a business expense deduction on his 1955 Federal income tax return.

In May 1956, an application for Tentative Carry-Back Adjustment (Form 1045) was filed by petitioner for the years 1953 and 1954. On

September 12, 1956, a Notice of Allowance of Tentative Carry-Back Adjustments for the years 1953 and 1954 was sent to petitioner. Subsequently thereto, petitioner received refunds of income tax for those years in the amounts of $7,639.90 and $7,885.92, respectively.

On petitioner's income tax return for the calendar year 1956, the balance of the $102,340.57 was deducted.

Respondent determined deficiencies in income tax for the years 1953 through 1956. The determination for the first 2 years and for 1956 reflected disallowance of a claimed net operating loss for 1955 which had been based upon the payment of $102,340.57 by petitioner under his guarantee, the claimed loss having been carried back 2 years and carried forward 1 year.

OPINION.

In 1954, petitioner was the manager and owner of substantially all of the shares of a corporation bearing his name dealing in coffee. He also conducted, in his individual capacity, a coffee business which was basically a local agency for a coffee importer, Hard & Rand, Inc. During that year the corporation received a loan of $75,000 from Hard & Rand, Inc. Petitioner personally guaranteed the loan in addition to what subsequently amounted to about $25,000 of accounts payable by the corporation to Hard & Rand, Inc. In 1955, the corporation having suffered severe losses and becoming hopelessly insolvent, petitioner pursuant to his guarantee paid Hard & Rand, Inc., the total owed by the corporation in the amount of $102,340.57. Petitioner deducted this amount on his 1955 joint Federal income tax return as a business expense. The net operating loss thereby created was deducted for the 2 preceding years, 1953 and 1954, and the balance was carried forward and deducted for the year 1956.

Respondent determined deficiencies for the years 1953 through 1956 on the ground that the amount paid in 1955 by petitioner to Hard & Rand, Inc., under the terms of his guarantee was not an allowable deduction. All of the deficiences depend upon the deductibility of the payment made in 1955, and the parties have stipulated that the deficiencies determined for the years 1953, 1954, and 1956, shall be determined by the amount, if any, of the operating loss deduction for the year 1955 to be used as a carryback and carryover.

The principal argument presented by petitioner is to the effect that the $102,340.57 which petitioner paid to Hard & Rand, Inc., on behalf of the corporation is a deductible business expense within the purview of section 162 of the 1954 Code. In the alternative, he argues that if it is not a deductible expense, it is deductible as a worthless business debt.

Petitioner's endorsement of his corporation's debt and his subsequent payment to Hard & Rand, Inc., was not abnormal in the course

of business relations. A situation may well arise, on occasion, in which one person assumes and pays the debts and obligations of another. These payments are made pursuant to various arrangements between the payor and the debtor and to various motives of the payor. It is not, however, always an easy task to characterize such a payment as a loan, an expense, or a capital contribution, or to classify it within the nebulous but necessary boundaries of applicable definition.

When a person voluntarily assumes another's debt without prior obligation, the determination of whether the payment gives rise to a capital contribution or business expense, on the one hand, or a debt on the other, depends upon whether a debt is in fact created. The term "debt" not only implies a legal obligation to pay, but also implies the expectancy on the part of the creditor to receive payment. *C. H. White*, 15 B.T.A. 1375, 1387 (1929). If a debtor-creditor relationship is established at the time of the debt assumption and the payor at that time reasonably expects to be reimbursed, a debt is created. *Richard M. Drachman*, 23 T.C. 558 (1954).

In *Glendinning, McLeish & Co.*, 24 B.T.A. 518 (1931), affd. 61 F. 2d 950 (C.A. 2, 1932), we stated (p. 523) :

It is well settled by the decisions of this Board that, where the taxpayer makes expenditures under an agreement that he will be reimbursed therefor, such expenditures, are in the nature of loans or advancements and are not deductible as business expenses.

On the other hand, if the debtor is not in existence at the time of the payment or is so hopelessly insolvent as to preclude any expectation of reimbursement or where reimbursement of no more than a small percentage of the amount of the advancement may be expected, it is presumed that the payor is not lending the money and that no debt is created. Such a payment would either be a capital contribution, or an expense, depending upon the fact situation. *Alleghany Corporation*, 28 T.C. 298, 305 (1957) ; *Putnam* v. *Commissioner*, 352 U.S. 82 (1956).

A problem arises, however, in the situation where one pays another's debts pursuant to a prior guaranty. At the time the guarantor is called upon to pay, the debtor presumably cannot pay and is many times insolvent, giving the guarantor little if any hope at that time of reimbursement. Therefore, application of the test of expectation of reimbursement as of the time of the actual payment would generally preclude classification of any such payments as debts and bring them all into the class of capital contributions if the circumstances do not support classification as a business expense. The courts, therefore, have determined the character of the payment pursuant to the guaranty as of the time of the guaranty rather than the time of the payment. If the debtor is, at that time, solvent and the guarantor does

not expect to be called upon to pay without reimbursement, any payments subsequently made continue to be regarded as debts albeit the debtor is insolvent at the time of payment by the guarantor. *George B. Markle, Jr.*, 17 T.C. 1593, 1598 (1952). Therefore, the fact that the corporation was insolvent when petitioner paid the debt and petitioner may have had at that time no expectation of being reimbursed, does not destroy the payment as creating a debt between him and the corporation if a debt was originally intended.

The Supreme Court of the United States in *Putnam* v. *Commissioner, supra*, has held that when a stockholder, as a guarantor of his corporation's obligations, makes payments pursuant thereto, the stockholder, by subrogation, acquired a debt, the loss resulting from the worthlessness of which can only be deducted as a bad debt.

The taxpayer who voluntarily incurs a debt with knowledge that he will not be repaid, however, is considered not to have acquired a debt, but to have made a gratuitous contribution to capital or to have incurred an expense. In contrast, the guarantor pays the creditor in compliance with the obligation arising from his contract of guaranty. His loss arises not because he is making a gift or incurring an expense, but because the debtor is unable to reimburse him.

The regulations provide:

Sec. 1.166–8  Losses of guarantors, endorsers, and indemnitors.

\*    \*    \*    \*    \*    \*    \*

(b) *Corporate obligations.* The loss sustained during the taxable year by a taxpayer other than a corporation in discharge of all of his obligation as a guarantor of an obligation issued by a corporation shall be treated, in accordance with section 166(d) and the regulations thereunder, as a loss sustained on the worthlessness of a nonbusiness debt if the debt created in the guarantor's favor as a result of the payment does not come within the exceptions prescribed by section 166(d)(2)(A) or (B). See paragraph (a)(2) of § 1.166–5.

This regulation is a reasonable implementation of the Code and is expressly directed to the situation in issue. Accordingly, petitioner's fulfillment of his obligation under the guaranty gave rise to an indebtedness due petitioner by the corporation. *Kate Baker Sherman*, 18 T.C. 746 (1952).

While evidence may be introduced in a proper case to prove that no debt was ever intended when the guarantee was executed and payment was made, we have no such situation here. Cf. *Hoyt* v. *Commissioner*, 145 F. 2d 634 (C.A. 2, 1944), affirming a Memorandum Opinion of this Court. The record in the instant case discloses that the payment of $102,340.57 which petitioner made was in fact originally treated as a debt and a debtor-creditor relationship was established between petitioner and the corporation. This amount was listed on the corporation's books as a debt owing to petitioner. Petitioner has acknowledged the existence of the debt and testified that he never

released the debt. Petitioner, in fact, does not contend that a debt was never created or that he never expected reimbursement when he guaranteed the corporation's obligations or even when he paid them. His sole basis for maintaining that the payments resulted in a deductible business expense is that he had to pay the amount in order to retain his good name in the coffee industry and that he has never been repaid.

Whether the payments or endorsement had any relationship to petitioner's business as opposed to that of the corporation, has a bearing on whether the debt was a business or nonbusiness debt rather than whether a debt or expense was incurred. *Richard M. Drachman*, 25 T.C. 558 (1954).

The petitioner relies upon *A. Harris & Co.* v. *Lucas*, 48 F. 2d 187 (C.A. 5, 1931), reversing 16 B.T.A. 705 (1929) ; *Lutz* v. *Commissioner*, 282 F. 2d 614 (C.A. 5, 1960), reversing a Memorandum Opinion of this Court; *Cubbedge Snow*, 31 T.C. 585 (1958) ; and *L. Heller & Son, Inc.*, 12 T.C. 1109 (1949). None of these cases, however, support petitioner's contention that the payment in question constituted an expense rather than a debt. In all of the above cases, the taxpayer paid the debts of another, but no debtor-creditor relationship ever existed between the taxpayer and the debtor. These cases do not involve a guarantee of another's debt and they arose under circumstances where, at the time the voluntary advances were made, the debtor was either not in existence or there was no indication that the taxpayer would ever be reimbursed. Likewise, there was no evidence that a debtor-creditor relationship was ever established, or that the payments could have created debts. The sole issue was whether the payments constituted expenses or capital contributions.

Upon the facts in the instant case, however, we conclude that at the time petitioner made the payments to Hard & Rand, Inc., on behalf of the corporation, a debt of the corporation was created in favor of petitioner. Thus, the loss which petitioner realized may be deducted, if at all, only as the loss on a worthless debt.

Respondent concedes that a bona fide debt was originally created between petitioner and the corporation. He contends, however, that petitioner subordinated his debt to the released claims and that his debt was written off on the books of the corporation, resulting in the conversion of his debt into a capital contribution which would not be deductible.

While the entries on the books are factors to be considered, it is clear upon the record that petitioner did not by any legally enforcible agreement, subordinate his debt to those of the releasing creditors. Upon the execution of the release, the interest of these creditors ceased and their claims were accordingly closed into paid-in surplus. Petitioner, however, was specifically exempted from the execution of the

release and he neither released, waived, nor renounced the debt due him. It may well be that he intended, voluntarily and under the "gentlemen's agreement," to cause the corporation to pay the releasing creditors ahead of him (and his subsequent conduct gives support to this intent) but he entered into no binding obligation to do so. We note, also, that while petitioner no doubt caused the corporation to pay to the releasing creditors the amounts totaling about $60,000 made subsequent to the execution of the releases (while he received nothing) the corporation was not legally bound to do so. Had petitioner desired to do so, he could have required the corporation to make such payments to him and any other creditor who had not executed the release.

We need not extend the discussion of respondent's argument, however, because, assuming that we reject it, the alternative is to treat the item (as we do) as a debt which is not deductible for the year 1955 for the reasons hereinafter stated.

Unfortunately, while the views we have expressed relate to essential steps in the ultimate determination of the case, they do not dispose of it. There remains at least the question of whether or not what we have held to be a debt became wholly worthless in 1955. Upon the record before us, we must hold that petitioner has failed to meet the burden of proving that the debt became worthless in that year.

Much has been said to the general effect that the corporation became hopelessly insolvent during that year. Such evidence might be sufficient, in a proper case, where worthlessness of stock is involved. It does not, of itself, demonstrate worthlessness of a debt. *Trinco Industries, Inc.*, 22 T.C. 959, 965 (1954); *Peabody Coal Co.*, 18 B.T.A. 1081, 1089 (1930), affd. 55 F. 2d 7 (C.A. 7, 1932).

Petitioner has introduced no evidence establishing that the corporation had no assets of value in 1955. If there were assets, and if there were no priority creditors, the claims of general creditors would not be worthless even though they greatly exceed liabilities.

The balance sheets of the corporation for the fiscal years ending May 31, 1955, and 1956, show assets in the respective amounts of $65,175.95 and $17,180.59.

The release executed by creditors in June 1955 refers to "assets of a value of less than $15,000." The release expresses the view that any attempt to distribute such assets ratably through bankruptcy would result in nothing to the creditors after paying costs and expenses. As a result of the execution of the releases, however, there were no bankruptcy proceedings and there is no evidence of payment of any such costs and expenses.

We are, of course, concerned only with the question of the worthlessness of petitioner's debt. As a result of the releases, payment

of part of the claim of Swanson and payment to creditors whose claims were $500 or less, petitioner and any other nonreleasing creditor possibly including Swanson to the extent of the balance due it (as to which the record is not clear) appear to emerge as the only remaining creditors. Whether further current debts arose after the execution of the releases is not clear from the record, but this would not affect the applicable principle. There is no evidence as to what the value of the corporation's assets may have been after paying Swanson in part and after payment of the claims of $500 or less.

The corporation's operations were continued in the hope that something might be earned for the releasing creditors and it actually paid over some $60,000 to these creditors in the several succeeding years. We are mindful, of course, of the "gentlemen's agreement" and that petitioner got nothing. There is nothing in the record, however, which supports any legal obligation requiring petitioner to take this position, and it appears, from the legal standpoint, that his action was voluntary. At the same time, he retained his claim and did not release it.

We recognize that petitioner's actions were highly commendable. Nevertheless, we are bound to examine the facts and law objectively, and whatever our sympathies may be, we cannot allow him a deduction to which he is not entitled. We are forced to conclude under all of the circumstances, that petitioner has not established the worthlessness of the debt in question in 1955.

In view of our determination that worthlessness in 1955 has not been proved, there is no occasion to discuss whether the debt in question was a business or nonbusiness debt.

*Decision will be entered under Rule 50.*