T.C. Memo. 1999-151


UNITED STATES TAX COURT


AUGUST V. AND MARY E. KLAUE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 13941-97, 20041-97.     Filed May 4, 1999.


<u>Lowell V. Ruen</u>, for petitioners.

<u>Sandra Veliz</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


PARR, <u>Judge</u>:  In two notices of deficiency, respondent
determined deficiencies in petitioners' Federal income tax for
1993 and 1994 in the amounts of $24,336 and $53,822,
respectively.  These cases were consolidated for trial, briefing,
and opinion by order of this Court dated February 12, 1998.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded to the nearest dollar, unless otherwise indicated. References to petitioner are to August V. Klaue.

The issues for decision are whether petitioners are entitled to a nonbusiness bad debt deduction of $266,323 in 1993; and if so, whether they are entitled to a capital loss carryover in the amount of $184,138 in 1994. We hold they are to the extent set out below.[1]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and the accompanying exhibits are incorporated into our findings by this reference. At the time the petitions in these cases were filed, petitioners resided in Spokane, Washington.

Petitioner is a sophisticated businessman, and at the time of trial he was chairman of the board of five corporations which were engaged in banking, lumbering, and aviation. In the mid-1970's, petitioner befriended Roger Estes (Estes). Estes is an

[1]Respondent determined that for the years at issue certain computational adjustments should be made which would reduce petitioners' itemized deductions. The parties can make these adjustments in their Rule 155 computation.

inventor and in 1980 held approximately 45 patents. Petitioner believed that one of Estes' inventions, the Theratech thermotherapy unit (Theratech device or the device), had potential to be a financial success. The Theratech device relieved the suffering caused by hemorrhoids without surgery. Petitioner used the device many times and was impressed with its efficacy, and he believed that with proper marketing it could be a moneymaker. As the inventor of the device, Estes held many shares of stock in the Theratech Co., which had the right to manufacture and sell the device.

On December 11, 1980, petitioner entered into a partnership agreement with Estes and created K & E Associates (the partnership). The partnership was created to finance a gold-dredging operation in the Columbia River. On January 16, 1981, the partnership borrowed $175,000 from Old National Bank (the bank), and petitioner and Estes as individuals and general partners of the partnership executed a promissory note in favor of the bank in that amount. Estes pledged 100,000 shares of Theratech[2] stock as collateral for the loan. Petitioner did not pledge any collateral. Estes authorized the bank to deliver the stock to petitioner if petitioner paid the balance of the loan.

---

[2]At the time Estes pledged this stock, the name of the company was Bio-tronics.

At the time Estes pledged the stock, it had a value of approximately $200,000 ($2 per share).

On September 2, 1981, petitioner and Estes as individuals and general partners of the partnership obtained an additional loan of $70,000 and executed a promissory note in favor of the bank for $245,000. This promissory note incorporated the previous promissory note and the additional loan amount. On December 8, 1981, petitioner and Estes returned to the bank and obtained a loan of $50,000 and executed a promissory note in favor of the bank in their individual and general partner capacities. Neither partner pledged any collateral for these loans.

On December 8, 1982, the partnership's loan balance was $294,000, and it owed the bank $59,762 of accumulated interest. On this date, petitioner paid $353,762 to the bank in full satisfaction of the promissory notes, and the bank released the 100,000 shares of Theratech stock to petitioner. At the time the bank released the stock, it had a value of approximately $1 per share.

Also on this date, Estes signed a promissory note in favor of petitioner for $176,881. The note provided for 10-percent interest per annum and payment in full on December 8, 1983, and thereafter on demand of holder. The partnership ceased all business activities in 1982.

The collapse of the gold-dredging venture and the transfer of the Theratech stock to petitioner in 1982 placed Estes in financial trouble. Expecting Estes to repay his debt to petitioner by selling the Theratech stock, petitioner placed the stock in a joint account that he opened with Estes at a local securities brokerage. Petitioner and Estes sold the shares in small amounts to maximize its sale value.

Although petitioner knew that Estes was experiencing financial difficulty, petitioner believed that once the Theratech device became a financial success, Estes would be able to repay the amount petitioner had lent him. Accordingly, rather than attempting to collect the outstanding loan amounts, petitioner advanced Estes additional sums, for which Estes signed promissory notes. Estes signed promissory notes for $52,381 on December 8, 1982; $12,534 on August 10, 1983; $5,000 on July 13, 1984; $4,000 on August 2, 1984; $2,000 on October 18, 1984; $3,135 on April 2, 1985; $300 on April 26, 1985; and $3,000 on June 28, 1985. Whenever petitioner advanced sums to Estes, petitioner or his secretary made a photocopy of the check for his records. Petitioner provided these additional amounts because he thought he needed Estes to promote the Theratech device. Estes used the money for living expenses.

Although these additional advances were evidenced by promissory notes signed by Estes and were payable on demand, only

the notes signed during 1984 stated an interest rate. Petitioner and Estes never executed any written loan agreements other than the promissory notes. On September 6, 1989, Estes signed new promissory notes to refresh the earlier notes, including a note for $12,000 that Estes had borrowed from petitioner in 1981. The new promissory notes provided that interest was due from the date of the original loan, and that payment was due as of the date of signing or upon demand. Estes made no payments of either interest or principal on these notes, and petitioner made no demand for payment until 1993.

During 1982, the Theratech device was being manufactured; however, the company producing the device was unable to market it in the United States because of FDA restrictions. As a result of the marketing problems the Theratech stock suffered a precipitous decline in value and was soon trading for much less than $1 per share. Sometime between 1985 and 1987, Estes received a letter from the Beijing Pharmaceutical Institute in Beijing, China. In China, the Theratech device was being used experimentally to treat rectal cancer. After a high-level Chinese Government official used the device and was cured of rectal cancer, he offered Estes the contract to build the Imperial Palace Hotel. Although Estes knew nothing about building a hotel, petitioner and a mutual acquaintance, who was an architect, did know about such development projects. Seeing an opportunity to revive

Estes' debt, petitioner, Estes, and the architect went to Beijing to investigate the hotel project and the market for the Theratech device.

Unfortunately, shortly after the party returned to the United States, and before any contracts were signed, the architect died. No further attempts were made to market the device in China, and the Theratech stock soon became worthless.

In 1993, petitioner demanded payment on the notes. Estes, however, was in the middle of a divorce, was without funds and living in the home of a relative, and was considering filing for bankruptcy. Estes transferred the title of his only asset, a power boat, to petitioner. Upon the advice of his attorney, petitioner decided that it would be futile to make further attempts to collect on the notes.

Petitioners claimed a deduction on their 1993 return for a $266,323 nonbusiness bad debt loss, and a capital loss carryover on their 1994 return. Respondent determined that petitioners were not entitled to the deductions.

OPINION

In the notices of deficiency, respondent disallowed the losses on the grounds that petitioners failed to establish the amount of the debt and that it became uncollectible during the 1993 taxable year. On brief, respondent argues that petitioner did not prove that a true debtor-creditor relationship was

established between petitioner and Estes or substantiate the amounts he transferred to Estes. The evidence introduced at trial by petitioner shows that he transferred the amounts at issue to Estes. Therefore, we do not consider this argument further in deciding these cases.

Respondent's determinations are presumed correct, and petitioners bear the burden of proving otherwise. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioners must also prove their entitlement to any claimed deduction. Deductions are a matter of legislative grace, and petitioners must show that their claimed deductions are allowed by the Code. See New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

Section 166(a) provides that a deduction shall be allowed for any bad debt that becomes worthless within the taxable year. Business bad debts are deductible as ordinary losses to the extent of a taxpayer's adjusted basis in the debt. See sec. 166(b). Nonbusiness bad debts are treated as losses resulting from the sale or exchange of a short-term capital asset. See sec. 166(d).

To claim a bad debt deduction for the amounts advanced to Estes, petitioner must prove that (1) a bona fide debt existed between himself and Estes, and (2) the debt became wholly worthless in 1993. No deduction for partial worthlessness of a

nonbusiness debt is allowed.  See <u>Black v. Commissioner</u>, 52 T.C. 147, 151 (1969).

A bona fide debt arises from a debtor-creditor relationship where there is a valid and enforceable obligation to pay a fixed or determinable sum of money.  See sec. 1.166-1(c), Income Tax Regs.  No deduction may be taken for money advanced without a reasonable expectation of repayment.  See <u>Zimmerman v. United States</u>, 318 F.2d 611, 613 (9th Cir. 1963).  Thus, for this Court to find that petitioner and Estes entered into a valid debtor-creditor relationship, petitioner must show that the loans were not contingent and that they were made with a reasonable expectation, belief, and intention that the advances would be repaid.  See <u>id.</u>

Contingent Debt

Respondent contends that repayment of the advances was contingent upon the success of the Theratech device.  Therefore, respondent contends that these advances constitute contingent loans.  Respondent argues that, because the Theratech device was never financially successful, the requisite contingency never occurred and the debts never became bona fide.  We disagree.

Respondent confuses contingencies with risk.  A contingency creates a condition precedent to the obligation to repay an advance.  See <u>Zimmerman v. United States</u>, <u>supra</u>; <u>Ewing v. Commissioner</u>, 20 T.C. 216 (1953), affd. 213 F.2d 438 (2d Cir.

1954). The cases cited by respondent are clearly distinguishable. In Zimmerman v. United States, supra, the taxpayers had advanced funds to a newly formed medical society. The funds were advanced until such time as the organization was financially stable and could repay a portion of the advance to the taxpayer without jeopardizing its existence. Given that there was no evidence that the contingencies (financial stability and ability to repay without jeopardy to the organization) ever occurred, the Court of Appeals for the Ninth Circuit held that no bona fide debt existed. In Ewing v. Commissioner, supra, the taxpayer advanced sums to a ballet company. The company's obligation to repay was expressly contingent on its having operating profits. Citing Clark v. Commissioner, 18 T.C. 780 (1952), affd. per curiam 205 F.2d 353 (2d Cir. 1953), this Court noted that a debt does not arise where the obligation to repay is subject to a contingency that has not occurred, and as the contingency (operating profits) had not occurred, we found that no debt was created. See Ewing v. Commissioner, supra at 229.

In the present case, there were no express or implicit agreements between the parties that repayment was contingent upon the financial success of the Theratech device. Both petitioner and Estes testified that Estes was obligated to repay the sums advanced. Furthermore, petitioner recovered as much of the debt as possible. Therefore, we conclude that petitioner's intentions

were not the same as those of the taxpayers in the above cases.
Accordingly, to the extent that we determine the advances in
these cases were loans, we do not find that the obligation to
repay was contingent upon the success of the Theratech device.
Instead we find that the obligation to repay the advances was
fixed; however, there was a sizable risk that Estes could not
repay the advances unless the device became a financial success.

Bona Fide Debt

A determination that the obligation to repay is not
contingent on some future event does not necessarily mean that
the loans are bona fide debts for purposes of section 166.  It
must also be established by petitioners that the loans were made
with a reasonable expectation, belief, and intention that they
would be repaid.  The determination of whether a transfer was
made with a real expectation of repayment and an intention to
enforce the debt depends on all the facts and circumstances
including whether:  (1) There was a promissory note or other
evidence of indebtedness; (2) there is any written loan
agreement; (3) interest was charged; (4) there was security or
collateral, (5) there was a fixed maturity date; (6) a demand for
repayment was made; (7) any actual repayment was made; (8) the
transferee had the ability to repay; and (9) the parties'
records, if any, reflect the transaction as a loan.  See John

Kelley Co. v. Commissioner, 326 U.S. 521 (1946); Zimmerman v. United States, supra.

The key inquiry is not whether certain indicia of a bona fide loan exist or do not exist, but whether the parties actually intended and regarded the transaction as a loan. See Estate of Chism v. Commissioner, 322 F.2d 956, 959-960 (9th Cir. 1963), affg. Chism Ice Cream Co. v. Commissioner, T.C. Memo. 1962-6; Estate of Van Anda v. Commissioner, 12 T.C. 1158, 1163 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951). Petitioner's intent can be established from an examination of the facts surrounding the transfers to Estes. For the reasons listed below, we find that petitioner had a reasonable expectation and belief that he would be repaid for transfers he made to Estes up to 1983, and that these transfers are bona fide loans. Transfers made after 1982, however, are not.

Rather than foreclosing Estes' collateral upon the failure of the gold-dredging operation, petitioner placed the stock in a joint account. As the inventor of the Theratech device, Estes owned many more shares than the 100,000 shares in the account, which had a value of approximately $1 per share at this time. Therefore, although Estes considered himself to be in financial trouble, he appeared to have financial resources and would be able to repay the advances. In addition, petitioner, who is an experienced businessman, had used the Theratech device many times

and knew from experience that it produced the desired effect on his hemorrhoids. Thus, petitioner's belief at this time that Estes would be able to repay and would repay the advances was reasonable.

However, soon after this time, the company manufacturing the Theratech device encountered serious obstacles in marketing the device. Petitioner testified that because of these problems, the stock traded for about 10 cents per share. Petitioner knew that Estes was dependent upon the financial success of the device and the sale value of the Theratech stock to repay his debt.

Although petitioner testified that he loaned Estes the additional sums because he thought that he needed Estes to promote the device, the problems with marketing were not related to promotion. According to petitioner's testimony, the marketing problems were due to an FDA restriction, something over which Estes had no influence. We do not think that an experienced businessman who was aware of Estes' financial situation after 1982 could have had a reasonable expectation or belief that Estes would be able to repay greater indebtedness. Accordingly, we find that the advances made after 1982 did not create bona fide debt.

Amount of the Bad Debt

The evidence submitted at trial substantiated that petitioner advanced Estes $271,231, $52,381 of which was to pay

Estes' debt to the bank for his power boat. Petitioners claimed a deduction for a bad debt loss of $266,323 on their return for 1993. Petitioner offered no explanation at trial for the difference in these amounts; however, on brief petitioners stated that the amount of the debt was reduced for the value of the power boat that Estes transferred to petitioner in 1993. We have found that only the transfers made before 1983 created bona fide debt. Accordingly, we reduce the pre-1983 bad debt amount by the value of the transferred power boat, which we find had a value of no less than $41,000.

Petitioner testified at trial that he placed the 100,000 shares of stock in a joint account with Estes, that he expected Estes to repay him from the proceeds of the stock sales, and that he and Estes sold the stock held in the joint account in small amounts to maximize its value. Evidence was introduced at trial which shows that the stock was sold; however, petitioner made no reduction in the debt for these sales. Accordingly, we reduce the amount of the pre-1983 bad debt for the sale proceeds of the 100,000 shares of Theratech stock that were placed in the joint account.

Year of Worthlessness

Petitioner asserts that the loans became worthless in 1993. Respondent argues that there is no evidence with respect to Estes' financial circumstances between 1993 and prior years that

establishes that the debt had value in 1993 and became worthless in that same year.  We disagree.

In ascertaining total worthlessness, the potential ability to pay has a bearing, and we have no evidence that such potential did not exist herein.  See <u>Pierson v. Commissioner</u>, 27 T.C. 330, 339 (1956), affd. 253 F.2d 928 (3d Cir. 1958).  Although Estes appeared to become insolvent sometime before 1993, insolvency would not show the debt was totally worthless.  See <u>Roussel v. Commissioner</u>, 37 T.C. 235, 245 (1961).  An excess of liabilities would show no more than that the debts of Estes were probably uncollectible in part.  See <u>Trinco Indus., Inc. v. Commissioner</u>, 22 T.C. 959, 965 (1954).  It is clear that Estes had some assets, as in 1993 he transferred to petitioner title to his boat, which Estes testified was his only remaining asset.  After this transfer, petitioner's attorney advised him that further collection activity would be futile.  Accordingly, we find that the debt became wholly worthless in 1993.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.